We have six consolidated cases, consolidated appeals, or tandem appeals on the calendar today, and they are all admiralty cases. So we will call this the Admiralty Mourning in the Second Circuit. This is why we have some porpoises and seashells on our ceiling, you'll notice. In the 1930s, when this courthouse was built, we were recognized as a great admiralty court. So we have a chance to prove it. So we thank you to the parties for conferring and agreeing on an order in which we'll proceed. I should let you know that we set the times for these cases before the briefs have been read in most circumstances. So it may be that we gave you more time than you'll feel that you need, so don't feel that you need to use every moment of time, but we've also got plenty of time, and thank you for helping us allocate it properly. So we will begin by hearing from the appellants in connection, the appellant suppliers. Good morning, Judge Livingston, Judge Barker, Judge Wesley. I'm Steve Sims. My clients are Aegean, SEPSA, Chemoil, and O'Rourke, who provided over $1 million of marine fuel called bunkers to the vessels whose lawyers you'll hear from today. And without our clients' bunkers, we would not be here, the ships would not sail, there would be no money involved. November 7, 2014, a day which for us started a lot of work, the collapse of OW bunkers. And there are four things that were new from November 7, 2014. The first thing, the question that every bunker supplier has heard since this, have you paid your physical supplier? That wasn't a question before November 7, 2014. The second question was, should there be a vessel arrest where the physical supplier was never paid? There's a lot of hypothetical that is going on about the question of whether that should happen, but the point is, before OW, it did not happen. Vessel arrest did not happen when the physical supplier was not paid, when the trader was arresting. The third thing, which did not happen before November 7, 2014, was interpleaders. And Judge Wesley's opinion in the U.S. oil case, Hapag-Lloyd case, is very much a part of what we're talking about today. Interpleader, essential equity. And so we have really double equity here. We have equity that we see in admiralty, which is an inherent part of admiralty, going all the way back to when admiralty courts and courts of law were running in parallel. And people who could not get the result in law would be able to get it in equity, in admiralty. And the inherent equitable nature of interpleader. And the fourth thing that we did not see and haven't seen anywhere else before November 7, 2014, is Clause L4 of the OW terms and conditions, which everyone here, all parties say, applied throughout every step of every transaction, no matter how many OW entities were between. Everybody agrees. The OW terms and conditions, including L4, applied and controlled. And here's the way to remember. How does that help your argument? I mean, it's also repeated often in these briefs that maritime liens don't arise from contracts. So that's a general proposition. How is it not applicable in this case? Your Honor, it is central to the argument. Because L4 enables the physical suppliers to be paid without the court having to go to the intermediate cases, Ken Lucky, or the contractor cases, Lake Charles Stevedores. What L4 says is that we will be assuring OW, we will be assuring that you get paid, physical suppliers. We will be assuring that you have your maritime liens, that your terms and conditions require. We will assure that. And it doesn't matter where you are in the transaction, because you are the only physical supplier of the bunker, third party. There was only one in each of these transactions, and it was in four transactions, our client. So how does that change it? Well, what do you think it is that Judge Forrest got wrong? Because that's what we have to deal with. At the beginning, and I think that when the haphazard opinion came down, I think you can remember what was going on. There was a lot of uncertainty. This has never happened before. A lot of uncertainty. That's an understatement. There was some sausage to be made. And so we got some sausage. Now we got to look at the sausage. What did Judge Forrest get wrong? Judge Forrest did not look at L4 as she should have looked at L4. And one of the things she tripped over was what L4 is all about. L4 is an exemption, like a tax exemption. If you have a tax exemption, you don't pay on certain things. This is an exemption. It says that in the headings for L4. To everything else. So she said, well, third-party terms are inconsistent with the rest of the terms and conditions. Yes, absolutely. That's what L4 is all about. It's an exemption from the rest. And it says, these terms and conditions, all the OW terms and conditions, are subject to variations in circumstances where the physical supply of the bunkers is being undertaken by third-party, our clients. Which insists our clients did insist. And she did not look back at the instance of insistence. AGEAN terms in the sales confirmation. There was a lot of discussion back and forth of what the significance of a bunker delivery receipt is. And we can set aside, is it regulatory, does it do something else? But what we see is that in the AGEAN confirmation and in the O'Rourke confirmation, it repeats their terms and conditions. That's an incidence of insistence. And in the terms themselves, it says, we are delivering according to these terms. And in each of the four transactions, each of the four transactions embodied the physical supplier's terms. Is that the only way in which there was any insistence? Because, I mean, these BDRs, if I understand correctly, and correct me if I'm wrong, they're at the very moment of delivery. Or, you know, it comes very late in the process to be insisting on your terms when the oil has already been delivered to the ship. Yes, Your Honor. They show consistent insistence. Consistent insistence, all the way from the beginning of the transaction when our people come back and say, yes, we'll sell you this subject to our terms and conditions. And then- That they only say to O.W. bunker entities. Exactly. Because, first off, there's no question the O.W. terms are a part of this. And here's an interesting thing in the O.W. terms. Look at the definition of buyer. And this is in Judge Forrest's opinion in six. Buyer means, probably you could include everybody in this room to buyer. Vessel supplied, master, owner, managers, or any party requesting offers or quotations or ordering bunkers for, da-da-da-da-da-da. Every supplier down the line is part of the definition of buyer in this. And so then it says, right, that insists that the buyer, by definition, O.W. terms, and if you look back at our supplier's terms, all these buyers are included, is also bound by its terms and conditions. And it doesn't matter if there was never a communication. This is also what I think Judge Forrest tripped over. By L4, there never has to be a direct communication between the physical supplier and the buyer. It says- So you're saying that there's an agency or that you're setting up a commercial relationship by being established by the supplier's terms retroactively and imposing them then ultimately on the ship, aren't you? It's not. And how does the ship-I mean, what's the certainty there with regard to the ship? It's not retroactive at all, Your Honor. You've got to get the ship ordering or implying that the ship is ordering the bunker, right? That's the first step. It's a statutory thing to imply that the ship has to order it. Yes, and then O.W. sends back its terms, and after-here's the step. And the O.W. terms have this provision in it to say if there's subsequent agreements down the line, then there's some modification of O.W.'s terms. But it doesn't say that to the extent that O.W.'s terms are inconsistent with later terms, the later terms apply, does it? Oh, it does. Well, what about set-off and other things like that? It says- O.W. is forfeiting its rights to set-off when inconsistent terms were available from the supplier? For the supplier's-amount that the suppliers do, absolutely. Absolutely. What this says is the suppliers get paid. Supplier's terms say we get paid. This says we incorporate the supplier's terms. And the sequence of the transaction is, first, the ship owner will say, I need bunkers. And they'll go out to a bunch of, in this case, traders. And the traders will go out to different suppliers and get quotes. And the traders will get a confirmation from the supplier, yes, we'll sell you at $100 a ton. That's when the supplier's terms come in. Then O.W. packages this up and says, okay, we'll sell you at $101 a ton. And already the physical supplier's terms are a part of the deal with O.W. And so with L4, it says- Yes. Go ahead. The terms and conditions shall be varied. Shall, shall, shall be varied accordingly. I get it with regard to terms, in terms of, like, payment stuff. But you've got to say that is your entitlement to the lien because of the lien language in the additional terms or because the L4 allows some kind of rearrangement of the understanding of the relationship between O.W. and the vessel, charter or the vessel owner? It provides both for a lien in rem and it provides for an in personam claim. To the extent that the contractual language is contrary to the statutory language, can the contract language abrogate the statutory lien? No, but it's not contrary. So the lien arises from the statute, not from the contract. Exactly. Okay. So therefore, anything that says that they have a lien doesn't mean they have a lien in any of the downstream contracts, correct? The statute, yes, sir, Your Honor, says, of course, that someone who provides on the order of the owner. So here's the order from the owner. It goes to O.W., bang, back through under L4. The way I try to understand this is it seems to me that the owner has to be responsible for or directing to some kind of relationship that works downstream to the supplier. Like, we know that we have cases where the owner says, use company X. And there, it's pretty straightforward. The owner has tied the hands of the middle person or middle people, and so therefore they're just passing along the owner's order. But here, there's independent judgment exercise for everybody down the chain. Isn't that what you just said? Traders go out and bid this, and they find suppliers, and then they make the decision. The owner plays no role other than wanting however it's measured. It's measured in weight, not by gallons? Yes, sir. So give me two tons of great number two fuel oil or diesel oil for my ship. If they're not picking anybody, how can you say that they're controlling that purchase? I'm not saying that. That's the wonderful thing about L4. They jump over that. They don't say, you don't have to. It doesn't matter. We're not disclosing who the purchaser is. But how does that show that the owners control the choice? That's my point. The owners don't have to control the choice. Is that what the statute requires? The owner makes an order to someone in authority to bind the vessel, and they certainly have done that. The charter has made its order through O.W. O.W. says, I am transmitting this order to the physical suppliers through L4, whose terms and conditions? Does the owner have the ability to disapprove the selected provider? Yes. Where is that in the country? It's the way the commercial transaction works. It's not in the country? It is not. It's probably in the O.W. terms. I'm not sure about that. But, Your Honor, Judge Forrest calls. That would be important to know. Nobody's said anything about that in any of their briefs. I mean, it seems to me if control is the thing that matters here, then I get the under – I can see the inequity, okay? I can appreciate the inequity that you're talking about. But this is a statutory lien. So I'm stuck with the categories for compliance to establish a lien. And I can't – I'm having trouble understanding how the owner has controlled the order. The owner says to O.W., I need a certain amount of fuel oil delivered at New York Harbor on such and such a day. And then O.W. goes out and does its thing. Your Honor, Judge Forrest has called Judge Haight the eminence grease behind all of this. And I want to point the Court's attention to Judge Haight's opinion in NCL v. O.W. Bunker where he applied L-4 exactly as we're saying it should be applied. And the owner didn't have a clue about who Echo was, except, of course, Echo pulled its barge up to the ship. And the master had to say, yeah, come on, hook up, there you go. And so they did know from that standpoint. But L-4, unlike Lake Charles, unlike Ken Lucky, doesn't require the owner to know anything except there is a third party which is providing the bunkers. Here there unquestionably was. The simple fact that they know that there's a third party means that they've ordered it from that third party? Through L-4, yes. Okay. My time's up, Your Honor. Thank you. Thank you. Good morning, members of the panel. Bruce Paulson for ING Bank. Just two seconds on who ING Bank is. ING Bank is the security agent under a $700 million revolving borrowing-based credit facility whereby the O.W. Bunker entities obtained their working capital. It is security agent for secured lenders. I thought they were the little orange rabbits of the Boyer commercial. Go ahead. I'm sorry. I apologize. Not to my knowledge. In any event, at the time of the day that Mr. Sims said would live in infamy, $640 million of that facility was drawn down. So ING Bank and the participants in the lender group are the biggest creditors and the biggest victims of the collapse of O.W., and they are the assignee of the receivables of O.W., which is why we stand here in the shoes of the O.W. entities that were the contract suppliers for these fuelings of vessels. I didn't have time to comb the O.W. Bunker terms and conditions as I sat here, but my belief, and we can correct that as I get up later, is that there is nothing in those terms and conditions about the owner rejecting the physical supplier. In fact, the evidence showed, and it's in the briefs and it's in the record, that in the most cases, and I know Judge Caproni referred to this and I think Judge Forrest did too, the owners in this case were indifferent to who the physical supplier was, didn't know or care who the physical supplier was. They wanted fuel aboard their ships of a certain amount and quality. O.W. as one-stop shop would provide that. If O.W. is the agent of the charter owner, then whatever orders O.W. gets received from the charter are orders to an agent who then conveys those to a third party or down the stream, and you have an agency chain going down, and that's how she kind of looked at it. She said there's no proof of agency here, and so therefore the suppliers, albeit the folks that come up and get stuck with some of this because of O.W.'s bankruptcy, can't meet the requirements of the lien. Is this what this boils down to? The statutory language is clear. Yes, this is what it boils down to. The party that gets a maritime lien is a party that provides necessaries to a vessel on the order of the owner or a person authorized by the owner. Authorized is the language of agency. Courts have put a judicial gloss on the statute identifying two lines of cases. You don't have to buy into the gloss if you don't want to, but it does provide a shorthand for understanding how the cases work. If indeed there is a chain of agency and the physical suppliers such as Mr. Sim's clients took orders from somebody authorized in an agency manner, an agent with all the manifestations therewith, places the order with the physical supplier, the physical supplier would satisfy the statute. But without that agency relationship, it doesn't. And there are persons and entities identified in CMLA, the Commercial Instruments and Maritime Lien Act, that are presumed to have authority, the master, the owner, the charter, and so forth, not O.W. USA or some other O.W. entity. The courts in the so-called second line of cases look at contractor-subcontractor cases. And in those cases, it's really an agency analysis, too. And the Ninth Circuit in Port of Portland confirms this because what happens is that subcontractors, as a general rule, and this is Judge Hayden integral controls, don't have liens because they rely on the credit of the contractor, the general contractor, not the vessel. So the only way they can have liens is if the owner somehow directed the selection or selected the subcontractor in such a manner that they're essentially working for the owner. And Port of Portland said, that's really like the general contractor being the agent of the owner. So in those types of situations, a subcontractor can have a lien. These parties are subcontractors under chains of contracts of purchase and sale and are subcontractors without liens. The lien analysis essentially ends there. I understand your adversary has been pointing to Clause L4 and to say, this clause in the O.W. standard contract somehow evidences an agency relationship, maybe when considered with the BDR. And so even in the usual case, there may not be an agency relationship. But when we look at that term and the surrounding facts, there is here. To be honest, I don't understand his agency argument. In Mr. Sims' physical supplier's briefs, he indicates that somehow the agency flows uphill from the physical supplier. That's not what the statute says in any event. Even if that was true, and I don't believe that it is, it wouldn't provide the type of agency relationships that would give rise to a lien. Well, it would certainly go contrary to the general understanding that the agency arises from either the expressed authorization of the principal or representations that the principal may make to the general public to close an individual with apparent authority to buying the principal. Generally, agency flows from the principal to its agent as opposed to through some reverse order that a third party is going to imply an agency relationship between the buyer that's standing in front of them and someone who's behind them who's authorized the buyer or employed the buyer, whether that buyer is an independent contractor on behalf of that person, that third party back there, or an employee, or an agent. I mean, it seems to reverse the idea of how agency is created. Right. Agency is never to be presumed. It arises from facts, from manifestations, be it actual or apparent authority. There's no record evidence of anything of the sort in this case. The fact is we have chains, and it's very clear, of contracts of purchase and sale at no point at the bottom of the sales order confirmation or anything as agents only or something like that. That language is not apparent. It's nowhere in the record, and the physical suppliers can't manufacture it. What do you make of the idea, though, that the other argument that he makes that has a little bit of a different twist towards it and some sting is that the vessels enter into these arrangements with O.W., and O.W.'s contract says, you know, if there are extra terms added or different— not different, I didn't mean to say different— extra terms added that those terms by downstream individuals, those terms will be part of our arrangement, and one of those downstream arrangements is the creation of a lien. Well, again, you can't create a lien by contract. That's the second answer. And the second answer is the L-4 argument is something Judge Forrest really got right here. You look at the contract, you look at Section A-3, general trading conditions of another party will not apply unless expressly accepted in writing by O.W.B. There's no evidence of that in this contract. The vessel's sole jurisdictional hook is in rem, isn't it? I'm sorry? Is the vessel's jurisdictional hook with regard to their claims for the lien just in rem? Are the claims just in rem? Yeah. In this case, Mr. Sims and his clients arrested the vessels in rem, and if I remember correctly, for instance, in O'Rourke, the claims against the vessel are only in rem and do not sound, for instance, in contract or in quasi-contract. Nevertheless, those arguments have been advanced both in the district court and here, even though they remain wholly unpleaded. Let me just go back to L-4 because Mr. Sims mentioned Judge Haight's decision in NCL. Let's be clear that Judge Haight in NCL found that the O.W. contract supplier entity in that case, O.W. USA, had the lien. There was no finding in that case that somehow L-4 transmogrified the O.W. terms and conditions in such a way that the physical supplier received or provided goods to the vessel on the order of the owner or someone authorized by the owner. That analysis is not in the case. The case is about whether the arbitration clause in that case applies and whether London arbitration that was sought by O.W. USA should be preliminarily enjoined. We can tick off a number of reasons why NCL is not applicable here. It focuses on arbitration. It did not consider the other portions of the terms and conditions such as Judge Forrest did and, in addition, turned on issues of Greek and English law not applicable here. So NCL found that O.W. USA has the lien and is otherwise distinguishable. What do you think is the rule this court should adopt and impose with respect to the meaning of provide? I think that the rule that the court should impose with respect to the meaning of provide is the one that's been followed in Clearlake by the 11th Circuit. Well, articulate the rule. Then you can tell me what its pro bono is. Essentially, providing necessaries means putting them on the ship, and there's nothing in the case law that, for instance, says that— You can get to the case law in a minute, but if someone were to have the responsibility of crafting a definition, what should it be? An entity, a physical supplier or a contract supplier that puts the fuel on the ship on the order of the owner or a person authorized by the owner has provided necessaries. So that in most cases is the contract supplier. In some cases, it can be the physical supplier if there's agency or if the owner has somehow selected the subcontractor or directed the selection of the subcontractor, which is not the case in these cases. So it's a simple statutory analysis. Provided is done, the necessaries have to be provided by a person authorized by the owner or on the order of the owner or a person authorized by the owner. And that can be in these cases like the OW entities, OW Middle East, OW USA, depending on the case, OW UK, OW Far East, that contracted, that had the contractual, that had the relationship, that had the direct link with the owner and the fuel was put aboard the ship. Well, what do you make of Judge Forrest's risk analysis? Yeah, we'll get to that in some more detail later, but the risk analysis was not an analysis ever done by any court who's ever looked at these issues. The risk analysis gives me a headache, to be honest. But even if she was correct, the fact of upstream and downstream contractual risk was in evidence, by way of the evidence put on the motion for reconsideration, that showed, and Judge Caproni and Clear Lake echoed this, the decision that Judge Forrest made on that question was entirely, to my read of it, evidentiary. We don't have the evidence of risk, and therefore there is no risk, therefore no providing. Who was going to sue? Who was the charterer going to sue if the bunkers weren't delivered? You. Yes. OW. Yes. Sounds like a risk to me. Yes. Okay, thank you. Thank you. Good morning. My name is David Potter, and I also represent ING Bank in just the AGN case. And our facts are very similar to the facts in the other cases, and so all of the positions that Mr. Paulson just laid out would apply to our case as well. And in our case, in the AGN case, Judge Forrest made many factual determinations that this contract was simply between Bergen Bunkers and AGN. In fact, the Bergen Bunkers contract itself expressly points out that the buyer in this case is Bergen Bunkers. And as Judge Wesley was talking about who would have sued if this wasn't delivered, well, who would AGN have sued if there was no OWB bankruptcy? They would have sued Bergen Bunkers because they extended credit to Bergen Bunkers. They were comfortable with the risk that they were taking by extending risk to Bergen Bunkers. And that's why in the contract it says Bergen Bunkers is the buyer. Yet Mr. Sims today, when he talked about what a buyer is, tried to go and say, well, the buyer in the OW terms is different, but the OW terms don't apply anymore. So in one sense he wants to use the definition of buyer in the OWB terms between OW Malta and JASPER, but then says these don't apply, and let's just forget about the definition of buyer in our contract. Not only that, but the invoice in this case was directly from AGN to Bergen. If this was some type of an agency relationship, we would have expected this to be in care of. So here, this is a bill to JASPER. Can you pass this on to them? And that's essentially what Mr. Sims has argued with respect to the agency relationship, is that somehow Bergen Bunkers was their agent for collections, and yet there's no indication of that in the record. Factually, all of these arguments are completely unsupported, and Judge Forrest made many factual determinations that simply cannot be found to be clear error because there is nothing in the record that would in any way contradict it. With respect to the risk here, and I'm not arguing the provision of risk, because we don't have the affirmative claim of a lien because we've resolved that with JASPER. But in terms of the unjust enrichment claim, first of all, it was never pled here, and Judge Forrest found it's not pled, you can't bring it up now. But secondly, Quantum Merowit is not designed to basically replace the contract that you made that you don't like anymore because you're in bankruptcy, and essentially that's what AGN wants to do. We want to take that contract with Bergen, throw it out because now they're in bankruptcy, and now we want the court to basically create a contract in equity between JASPER and AGN. And finally, the idea that this is an unjust enrichment by itself I think is flawed. Both of these parties, ING and AGN, extended credit to a party. They extended credit to an OWB entity, and both of them took risk. That's inherent in the nature of what a contract is. And if the whole concept that it would be somehow just to basically take away the security interest of ING and replace that with an equitable concept, basically favoring one creditor over another, I think would turn the whole idea of unjust enrichment on its head. And secondly, I think it would be bad for commerce in the maritime industry because Mr. Sims in his brief talks about how commerce would be affected by the fact that physical suppliers won't provide fuel to ships based on the fact that they don't have liens. But it's been since 1922 that subcontractors haven't had liens in the Juanita. And in this circuit, integral control set forth exactly that same concept. Subcontractors don't have it. And there's been no evidence that there's been an effect on commerce. And yet, if you tell lenders to the admiralty and maritime industry that you are not going to be protected, we're going to supplant your security interest with equitable arguments, then you're going to see a drying up of financing in the maritime industry, and that will affect commerce. If there are no other questions, I'll go. Thank you very much. Good morning, Your Honors. Gina Venezia here representing the vessel owners in two of the appeals, JASPER in the Aegean appeal and COSTCO in the O'Rourke appeal. At the outset, we like to stress that as vessel owners, our overriding concern is that we not be compelled to pay twice for the same bunkers, which is why we commenced interpleader proceedings in both of these cases. Your Honor has already found that the use of interpleader is appropriate in this context. The interpleader issues were rendered moot by virtue of the district court's finding on the physical supplier's lien. But if this court reverses, then a remand is necessary so that the district court can analyze the issues that arise with respect to the competing claim of a maritime lien from the physical suppliers and the competing claims from ING, which were stated as contract claims and lien claims. So if Your Honors... So you settled on the amount? Basically... You settled on the amounts, what was it, $900,000 and $240,000 or something like that? We settled on the amounts and also what we agreed is that if the district court judgments stand, then they are entitled. But if not, there's a reversal. We need to go back. And as Your Honor recognized in the HAPAC case, when you're looking at these competing claims, that may require the district court to untangle complicated questions that we submit are best left for the district court to analyze at the first instance, hence a remand. Like the legitimacy of the assignment? Any number of things. Legitimate assignment, how much should be paid, to whom, to where, that sort of thing. Okay. So having said this, it is our position that the district court was correct in determining that the physical suppliers do not have a maritime lien. I want to stress also that in these two cases, the Aegean appeal and in the O'Rourke appeal, the only basis for a claim against the vessel and the vessel owners are an in rem lien claim. Right. There were no direct claims asserted, direct contract claims asserted against the vessel owners by the physical suppliers. In the Costco case, there were no direct claims. Costco is the O'Rourke case, sorry. In that case, there were no direct claims asserted against Costco by the physical suppliers at all. You can look at appendix pages 39 to 46 for that. And in the Aegean case, the only claim asserted against Jasper by the physical supplier was an unjust enrichment claim, which you can see at pages 62-63 of that record. No direct contract claim. So earlier today, you heard Mr. Sims say that Clause L4 gives him, among other things, in personam rights against the vessel owners. That entire discussion is irrelevant and immaterial in my two cases because there were no such claims pledged. The district court noted those absences in their opinions. That was correct. The district court was correct in not granting any relief to O'Rourke or to Aegean based on unpled direct contractual claims. Turning to the lien issues. In these two cases, everyone agrees that the requirement of the lien act that is at issue is the authority requirement. The fact that the supplier has to prove that it supplied the bunkers on the order of the owner or a person authorized by the owner. Well, the statute says agent. Your Honor. When I heard one of your predecessors say authorized, all of a sudden I got nervous that maybe I missed something in the statute. But the statute says agent. What it says, Your Honor. Authorized, you know, now you're starting to fool around with the fact that you tell OW bunkers to go out and hire somebody to provide you with bunkers. It does, Your Honor. You're correct. In Section 31341 of the act, the act sets forth those who have presumed authority. And in that list, it's owners, it's agents. And that section confirms that what the act is concerned about is whether someone is acting as an agent and is ordering the bunkers from a supplier on the vessel's behalf. Does that entity have the power to convey liens on the vessel? That's what the act is concerned about. That is what the wealth of authority establishes. This district court, they didn't announce, the district courts here did not announce any new rule of law, not a novel interpretation of the act. Both in our case, remember, Judge, in the Costo case, Judge Shinlin addressed these issues first. And Judge Forrest addressed them on reconsideration. And in the Aegean case, they decided about Judge Forrest in the first instance. So we've had two district judges examine these issues. And both district judges concluded that the suppliers could not establish the order requirement. Now, we sit here today, and what we hear all about is Clause L4, Clause L4. And what we heard today is that Clause L4, Mr. Sims, is Clause L4. What that is, it should be interpreted as being a guarantee that the physical supplier will be paid no matter what. I want to also emphasize that in the district court, there was no elaboration of this argument to that extent. There was no submission on English law. There was no testimony from witnesses to support it. There was no document to support it. There was nothing presented to the district court to advocate for this position that we now hear today. There was the repeated mantra, L4, L4, L4, L4, makes my terms apply, but no explanation to the district court. And I submit none here to explain how that clause was triggered, how that clause brings their terms up through the entire chain to the top, or how that clause bestows lien rights. The argument trumps the statutory requirement. Correct. It sounds to me like a contract argument that quite clear doesn't trump the statutory requirement. That's right, Your Honor. And there was no elaboration of that before the district court, and none here as well. So one other thing. So the interpretation being advocated was not presented fully to the district court. So then even if you get to the interpretation, the language in Clause L4 does have, without a doubt, factual predicates that need to be satisfied, insistence and also bounds. Now, Mr. Sims said today, of course there was insistence. Of course there was insistence. I would like to talk about the Costco case and the Eugene case on that point, if I may. In the Costco case, again, no evidence of insistence. And as we sit here today in the appeal, we don't even see any evidence of that either. In the main brief of O'Rourke, they argue at a footnote on page 7. They argue, of course there was insistence because here we are, we filed suit. That reasoning was even rejected by Judge Haidt in the NCL case that they rely upon so heavily. Even Judge Haidt said that post-contracting activity and the filing of suit does not trigger the insistence of that clause. Secondly, O'Rourke said earlier today that of course our terms applied. That is not true. And in the Costco case, I want to just say it was Costco, OW4E, OWUSA, O'Rourke. It is uncontested that O'Rourke communicated only with OWUSA in the contracting phase. Only. The documentation exchanged between those two, you can find it at record pages 382 and 383 and 399 to 400. Those are the purchase and sale confirmations exchanged between the two. No mention of AGEAN terms. None. There's not an email, a testimony, anything that AGEAN even said to its contracting party our terms apply. And yet they stand before this Court and say not only did they apply to OWUSA, they applied to OW4E and they applied to Costco. So there's no evidence of insistence and no evidence that anyone was bound. It also bears mention that those terms, and you can see them at record pages 277 and 278, they had a blank line on each page for the contracting counterparty to initial. No initial copy in the record. So your position is basically if you wanted to rely on if that term is relevant to establishing the agency relationship, what the ship supplier would have to show is that even though maybe OW Bunker reached out, so we started from the top bottom, then from the bottom up we said, no, we need to deal directly with the owner. We need to know that the owner has authorized us to provide this fuel oil and we'll be paid. You'd need essentially to turn the OW Bunker affirmatively into an agent by some rearrangement, affirmative rearrangement of the contractual rule. Well, that is certainly their argument. And I'm not so sure, Your Honor, that, you know, Clause L4. It works even that way. I don't even know if Clause — I do not think Clause 4 accomplishes what they suggest, period. Their position is that it acts from the bottom up and pushes up and creates an agency required by the Act. Now, I also want to emphasize in both of these two cases, in the main brief submitted before Your Honors, the position was that Clause L4 makes OW their agent. In the reply brief, we hear that Clause L4 makes OW their agent and our agent. So the argument shifts. Double agent. Double agent. They are. Exactly. Exactly. They do very well for that. Exactly. And so, Your Honors, again, in the Costco case, it bears repeating. No evidence that the AGEAN terms even apply to their own contracting partner. To be fair to Mr. Sims, you've been beating him up pretty bad. But, you know, he's only got so many bullets and he has to use them. But I would suspect that his argument is that the charterer owners signed these agreements with OW knowing that the terms of their agreements might be altered by L4. And so, therefore, it's not really pushing the agency back up. It's understanding that somehow the relationship between OW and the charterer could somehow be altered by subsequent terms of a party downstream the commercial transaction. I mean, that's another argument. Of course, Your Honor. That is the argument. Again, not articulated as summarily as you have stated and certainly not presented to the district court in that matter. But I think when he refers to the NCL case, what I think is important to note in the NCL case, what Judge Kate addressed, a very discreet issue, not the issue they sit here and say. Here he says L4 results in a wholesale displacement, makes the guy at the bottom chain actually someone who has a direct link with the head owner. The NCL case, Your Honor, what the court said that L4 accomplished is it altered the term between those two head parties. And it changed their relationship, not that it created a new relationship. So although I think that is what his argument is, no support for that in this record. None. And the NCL case doesn't support it. I do want to say one thing about the Aegean case, Your Honor, because I talked about the Costco case. Now, in the Aegean case, again, no real submission on what, you know, how L4 accomplishes what they say it accomplishes, nothing like that. But in the Aegean case, what I think is important, and you heard Mr. Potter mention this, also, no real demonstration of insistence. Again, we see here in the main brief a footnote in page 7, which is the only place that insistence is addressed before this Court. And they refer to the signing of the delivery seat, the issuance of the invoice, which was issued only to Bergen, by the way, and the fact of this litigation. And, again, I emphasize that even under the NCL case, and you can find this at page 55 of that opinion, Judge Tate concluded that post-contracting activity such as that is not sufficient to trigger an application of Clause L4. But I think it's important that in the Aegean case, because their position is that their terms get brought up into the head contract, that is their position. They say Clause L4 accomplishes that. What the Aegean terms do, the Aegean terms, and you can see this at page A191 in that record, they define the buyer singularly as the entity who entered into the contract, that is Bergen, and that is why the invoices were issued to Bergen. But more importantly, and I stress this, the terms, the Aegean terms, the lien language at page 194 of the record, only state that the seller has a lien to the extent the applicable law allows. That's what it says. It merely confirms that if the law otherwise grants a lien, then they have a lien. And that makes sense because everyone knows, every maritime practitioner knows that maritime liens are not created by contract. And so for that reason, that is all that the terms say. So even if, even if someone would adopt the interpretation advocated by Aegean, even if someone would find that the factual predicates were satisfied, neither of which was found by the district court, even if you get there, their terms do not assist them in this case because the terms merely say that the buyer, i.e. Bergen, is responsible for paying it, and alternatively we have a lien to the extent the law allows. Now, I think the district court did a very good job of examining, in both of these cases, the facts and the circumstances of the relationships. They examined copious amounts of documentation, witness testimony, documents related to the contracting of the parties, the BDRs, everything else. And on the BDR, Your Honors, I submit that the impact of that is a question of fact because it has to be analyzed in all of the circumstances. And so therefore, the district court's determination about the impact of the BDR is a factual determination, and it is not clearly erroneous. Your Honors, the district court got it right, and my two district judges got it right. The only claims pled against my clients were maritime lien claims. They do not satisfy the Act. It is a statutory requirement. Clause L-4 doesn't count today. And unless there are any more questions, I am done, Your Honors. Thank you. Thank you. Good morning. James Power from Holland and Knight. Four appellees in the cases involving the MV Tamora, the Maritime King. And the Vogue Fiesta. I'd like to just give a little bit of background facts and separate to some degree the cases that I'm involved in and the cases of these others because there is a lot of moving parts and a lot going on. We're involved in three cases. These were unique cases separate and apart from the interpleaders in that they were initiated via an action for an arrest by ING, and then the various physical suppliers, SEPSA in one case and Chemoil in another, intervened to assert their in-rem rights against the vessel. In these three particular cases, we have the vessel owners only. It's the Tamora case as well as the Vogue Fiesta case. It's only the vessel owners, the actual legal owners of the vessel have appeared pursuant to a restricted appearance to defend against the arrest. In the Maritime King case, which is slightly different but notable, the charter appeared on behalf of the owner because under the charter, the contract with the owner, the charter was the one legally responsible to order the fuel. It was for the charter's benefit, the charter's use. The owner simply had the vessel and the charter was ordering the fuel. The charter was the buyer. So this charter, of course, if it allowed liens to be allowed against the vessel, the charter would be liable under that contract. So it's this whole domino effect. So the charter in that particular case stepped up and said, listen, I ordered this fuel, I owe someone for this fuel, not two people, and even if I pay one person, I'm now still liable under my contract to the owner to make sure that the vessel doesn't have a lien against it by someone else, the person who I did not pay, for example, the physical supplier. So in the Maritime King case, the charter did pay ING ultimately after the decision of Judge Forrest, so ING is no longer in that case. So now what are we left with? The charter having satisfied the full obligation of the vessel sale, the fuel sale agreement, is now left with a physical supplier who's still saying, well, I know I didn't contract with Coblefret, the charterer, but I still nonetheless have a lien against the vessel and we're going to wind up trying to get a scenario where one person pays as the buyer of the fuel and the vessel pays the physical supplier merely because the physical supplier is asserting that it is the one that has a statutory lien. So that is sort of the absurd result that we can see in these different cases. With respect to the other two cases, which is the Tamara case, which involves SEPSA, one of the unique things that we've done, I don't believe anyone else did, which is a procedural matter, is we did move to the Smith v. Beale for a very simple procedural issue that it's time-barred. Now, I don't know if the panel has any questions with that. I'd like to certainly stand on our papers there. Now, of course, we have heard from very competent counsel before me on the L4 issue, so I do not really intend to continue on with that. I adopt the arguments in that regard against physical suppliers' arguments as to why L4 should suddenly now give them a lien, which it shouldn't. They were simply a subcontractor. The owner, particularly the owners, in the Tamara case and the VOPSESTA case, had nothing whatsoever to do with ordering the fuel, had nothing whatsoever to do with dealing with the physical supplier, except for the fact that, as is customary in industry, once fuel and after fuel is delivered to the vessel, the vessel owner and the captain and the people on board simply as part of their responsibilities file an acknowledgment of delivery, the amounts on there, and sign off on the bunker delivery note, which can then be passed up the line to all the folks who the owner doesn't know are involved in the contract for the supply of fuel. So one of the other things that I would also like to talk about in this particular case is just in general from an owner's perspective, and this is an owner who was not the contract party, these are innocent vessel owners who are simply the victims in many cases of overreaching for parties trying to get a lien. A lien is so powerful. The United States grants liens for these necessaries where other countries do not. So it's very interesting here. Perhaps the only reason why we're even talking about liens in this particular jurisdiction is an OW contract, for whatever reason, I'm slightly skeptical that it really does this, but the OW terms and conditions say that liens shall be decided under U.S. maritime law, which is quite interesting because, frankly, if we're all in acknowledgment, and there's not one lawyer here who's going to argue otherwise, is liens are not a creature of contract. They're a creature of statute. So it's somewhat curious how OW's terms and conditions could even say that by way of a contract they're creating a lien because they've incorporated U.S. law. But I put that aside for the moment. These vessel owners are now in a position, this is in the Tamar case and in the Vogue Fiesta case, in being in a situation where there is an attempt to impose strict liability on the vessel. Whenever there's a fuel sale, suddenly the vessel is strictly liable and the vessel must pay someone. That is the argument being put forward here by ING and the physical supplier. Now, I submit Judge Forrest looked at this, and in the context of this case, the very peculiar facts of this particular case involving all of us, involving OW, involving ING, unlike every case before us, Gale Head and every other jurisdiction around the country, that got a chance to decide this. These facts are so unique, so particular, and so troubling, which is why Judge Forrest recognized that this theory of a risk is illusory. There is no risk here as to who was going to pay, because OW knew— What do you mean you say she thought it was illusory? Yeah, the risk is merely theoretical. Theoretical? Theoretical. In other words, one of the panel asked who would sue? I did. Okay, so let me answer that question, who would sue here. So it's a very interesting issue here. So you asked who would sue OW if the fuel wasn't delivered. Well, that's sort of theoretical who would sue them. I would suggest probably nobody, because they would have just went and got fuel from somebody else. Yeah, except that if they had to cover and the price of the fuel that they were going to get was $1 a ton and they paid $10 a ton, they sure as hell would sue OW. What if they bought it for less? Now we're really theorizing. Then they wouldn't have any damages, but that's theoretical. That's why I don't understand this risk. They have a contract. OW agreed to do something, and if OW hadn't, they could have been sued. So let me address that risk in an even more particular term. What if OW had provided diesel fuel that had water in it? OW had been mad at the physical supplier, would have been pursuing remedies against the physical supplier, but the charter would have no remedy against the physical supplier. The charter's only remedy would be against OW. So there is definitely a risk. There is a theoretical risk. What do you mean theoretical? Because, again, let me also – I think there's a legal risk. There may not be a great risk because OW supplied and complied with the contract. Therefore, there was no risk. But then OW goes bankrupt. Now the risk is all of a sudden down the chain. But to say there's no theoretical risk, I don't understand that. Because what I think Judge Forrest analyzed, and what I believe is the actual – the way this panel should look at it is, it's not the risk of being sued. It's not the risk that you may have to cover the delta. It's the risk that you are out of pocket for the entire amount of the fuel supply. That's why OW is bankrupt. Guess what? I wonder why. Because they did a lousy business, and ultimately they failed on their contracts, and now people are suing them. So that sounds like risk to me. The problem is the pot's too small. But that is not the risk that gives rise to the lien. That's all I'm saying. The lien would be irrelevant if someone hadn't taken an inappropriate credit risk. If OW had supplied the bunkers, as they did in many of these cases, and then the charter doesn't pay them, OW is at risk. They don't have any money. That may be part of the reason why they're bankrupt. And maybe part of the reason why they're bankrupt is because elsewhere they don't have liens. But if they're the person who provided the bunker, then the statute gives them a lien. Right? In some instances. You want to go to the cross-appeal with regard to AIM? Because what I don't understand is nobody contests, no one contested that there was a relationship down the line, and the judge, sua sponte, without notice, dismisses ING's claim with regard to the lien. Without notice. And then on a motion re-argument where they said, geez, we'd like to show you the contracts because you said the absence of these contracts is the reason why we lose. She won't even entertain it. When no one contested the existence of those agreements or the relationships that were created by that. That doesn't seem right to me. Well, for one, we objected to the lien, and it wasn't on the grounds that they didn't submit the two contracts. Did you cross-move to dismiss ING's claim for a lien? No. You did not. Well, because our defense is, again. But you won. Isn't that curious? You won sua sponte without notice to ING whatsoever. We won, I think, because Judge Forrest understood the background facts of this case.  She didn't have the contracts. No, no, no. The contracts are irrelevant to whether or not those middle contracts are relevant to whether or not ING had a lien. ING does not have a lien here under the statute. It did not supply necessaries in good faith. Everyone talks about November 7th as the date that we should be focusing on as the doomsday date that OW filed for bankruptcy. Let me tell you. It was many, many, many weeks prior to October 7th. It was prior to any one of these alleged fuel supplies was entered into that OW knew it could not pay anyone. When you enter into a contract knowing you are incapable and will never be able to pay, that is not the supply of necessaries in good faith. That was the ground upon which the judge made her determination. I quit about that in her decision. It was in the record. We discussed it many times. I didn't say that. The record is not her decision. Her decision is what we review. We affirm her. We reverse her. We affirm in part. We reverse in part. We don't affirm the record. We affirm the judge and the judge's decision. And I believe this judge, if there was a reversal in part, then these are the issues that are going to be brought before the judge. And the first is, again, the assignment that whether or not a party who is insolvent, who intends to — Would you think it would be beneficial to have everybody have a chance to actually address them? We certainly raise this, and that was going to be a topic for a later discovery. Now, again, I've read Judge Forrest's opinion many times. And so I do not read her opinion as being solely based on the lack of the original submission of the two middle contracts. I read her opinion as, again, understanding that the supply of necessaries had to be in good faith. And if a party, which she said there, that at the time of their supply, they didn't pay, they don't intend to pay now, and they never intend to pay, that embodies the principle that at the very start, when the initial contract was initiated, when O.W. was going out and marketing itself to be that fuel supplier, it should have never been doing so. Now, again, so what really would have happened if O.W. had disclosed to anybody in the industry, listen, we're broke. We're going to enter into this contract. No one would have accepted that contract. Now, we're adjusting the ING's arguments, which are coming later. Do you want to reserve or start using your time? I will reserve those arguments for later. I think that's a good idea. Thank you very much. Thank you means you're done. Yes. Judge Parker, I wanted to respond to your observation on what L-4 does and its relationship with the statute. Thank you. L-4 does not, and we're not saying that it overrides the statute. What it does is make the statute operable, and L-4 needs to be read. Among the big questions here is what does L-4 mean? It's in there for a reason. It's in there for a reason. Why is it there? What does it do? What does it mean? What does exemptions mean? Exemptions take it out of everything. It stands alone by itself. What does it mean? In such circumstances, these conditions shall be varied accordingly, and the buyer shall be deemed to have read and accepted the terms. Buyer in O.W.'s terms, which are defining buyer, right? These are O.W. terms. Buyer includes everybody. And then the physical supplier's term says we have a maritime lien. Now, how do they have a maritime lien? And this goes to another question, Judge Parker, you had. Persons presumed to have authority. And, Judge Wright, you referred to the agents, too. 46 U.S.C., 31341. Presumed to have authority. The owner, the master, the person entrusted with management and a vessel at the port of supply. How did these barges get here? Somebody was working for the owner. And the physical supplier's terms say we're providing this. We've shown up because somebody from the owner has the authority to say show up. And so we connect. And we deliver the fuel. And then down here, I've heard it said a couple of ways, but the term is stricti juris. Stricti juris means read the statute for what it says. And the New Star amicus brief did a great job on this. And so I'll just refer the court back to that. But stricti juris does not, when you read the statute, does it say contractual privity? It doesn't say that. It does not say that. But if you need the contractual privity, L4 provides that. Except as provided in Section B, which doesn't apply here, a person providing necessaries to the vessel. We are a person that provided necessaries. No argument there. On the order of an owner, L4. Order of an owner. Buyer. Or person authorized by the owner. How did the stuff get there? The owner. Without L4, let's assume L4 didn't exist, you would not dispute that O.W. was not a... There wasn't enough contractual privity. We have... The best metaphor I have is climbing up El Capitan and we're looking for handholds. And Ken Luckey is a handhold. In our briefs, we don't think the admission of the owner that they were in direct privity has anything to do with it. We just refer the court back to Ken Luckey. But if we're stuck on Blake Charles, yes, that's a split there. But Judge Parker, what I'm saying is when you look at L4, when you look at the statute, it connects it up perfectly so that the order comes through the owner. There is a maritime lien. The only way you get to be an owner is through L4. That is correct. Yes, through L4. And the question of whether there was sufficient evidence, we were at summary judgment stage. There wasn't testimony at summary judgment. Basically what we had was, we say insistence, and it wasn't just the insistence of showing up later. I understand what Judge Haight says. It makes perfect sense. We had consistent insistence, consistent, beginning from the terms. Even though you're a supplier, it's your argument that, if I want to be sure I understand it, that L4 makes you an owner. It makes us a person who is providing necessaries to vessels under 4631-342. That makes us the entity that, one, has a maritime lien on the vessel, may bring a civil action to enforce the lien, is not required to allege or prove that credit was given to the vessel. And, again, if you're wondering, well, was there insistence or anything? Do we have to allege and prove that under 31342? A strict digeris says, doesn't say that. Doesn't say that. Now, responding, Judge Wright, to your question of risk, first we have two of these cases that are directly in interpleader. One thing that is important to point out is that Adani and O'Rourke both had title retention clauses. And they said, this stuff isn't yours until you pay for it. Now, how can ING then claim, I've just gone and ripped off the 711, and now I'm selling the diapers I just ripped off, and I'm entitled to that, right? That's an assignment right. Well, no it isn't. The only right that ING can have, let's start with those, is maybe for the commission, which makes perfect sense. In the Martin Energy case in Florida, it's the only interpleader case that has been tried to date. And the judge in the Martin case said, at the end of his opinion, he said, you know, this is the way it comes out. It's the only way to make sense. I'm going to give to each party, for each of their risk, what is due them. And so ING got its piece, which was a couple thousand dollars. The physical supplier got paid. Same in Camputex. Now, Camputex is back before the trial court in Vancouver, but the two L4 clauses are basically the same. And the reason we pointed that case up, alongside what Judge Hates, is they're the only two courts in the world that have considered L4 thoroughly and answered the question, what does it mean? What does it really mean? Why is it here? What does it mean? Well, what it means is that OW was going out to physical suppliers and said, don't worry. You will be paid. We have L4 in here. You will be paid. You will be paid. You can arrest the ship. And you also have an in personam claim against us if you're not paid. And that's the whole purpose of maritime liens. You have an in personam claim. But very frequently, charters and owners disappear. Then you have the ship. OW says, that piece is yours for the physical supply amount. That piece is yours. We'll take our commission. Now, conceptually, and again, I started out saying, this is the question everybody asks, post-November 7, 2014. Isn't there, I'm interested, you were talking about that title. And I'm trying to think through how that juxtaposes to statutory lien, which is not a function of the contract language. But let me ask you this. In terms of the bankruptcy, if you're right that the title didn't pass with regard to the product until after they were paid, then wouldn't your claim be in the bankruptcy court that even if they had the lien and they collected the money, that that's not an asset of the estate, that your contract claim is not really against the estate, it's your property and you have a secure position in that regard? There were a couple of lines in the ship owner's brief that said, and the supplier's claims are not right because ING hasn't been paid. So therefore, they have an unjust and risk claim against ING. The answer is, we think they do, once they're paid. But in the bankruptcy court, do we have bankruptcy claims? Yes, but that's the in personam claim. As a general creditor. Right, as a general creditor. But because of L-4, because of the way the similar federal maritime lien operates, the physical suppliers don't have to just get stuck with their in personam claim. They're paid through the maritime lien. And this is where the interpleader does come in. We are an interpleader. And yes, we did talk a lot in our briefs about unjust enrichment and quasi-contract and that sort of thing, which is because, not because we're claiming against the ship on that, but because we're an interpleader. Or in the case of the Tamora and the Adani cases, we're an admiralty, we're an equity, we have all the parties here. The motivation which got U.S. Oil and Hapag-Lloyd up to your honor, for that opinion, was the worry that there would have to be multiple payments claimed. Okay, well now, that is front and center. Before November 7, 2014, that hadn't been a concern. It hadn't been a concern. Nobody had answered the question, now wait a second, ship owner, when do you get your ship arrested? By a trader. Why don't you ask the question, did you provide value for this? Did you pay the physical supplier? Oh, you didn't. Well, in that case, you get your 2%. That's it. That's all we owe you. Take it back to the district judge. I agree with your argument. We have to disagree with the Eleventh Circuit and Barcliff. Barcliff hung on the Lake Charles and Ken Luckey cases and they said, we're going with Lake Charles. This looks more like Lake Charles than Ken Luckey. What we're saying is this court, because of L4, does not have to go there. Barcliff didn't consider L4, didn't mention it, didn't get into it. On the other hand, in Interfleer, the judge in the Martin Energy case certainly did look at it. And he said, this is exactly the way it's supposed to be. Why am I going to, especially with L4, give ING the benefit of something it never paid for? It never could take assignment for. It was like the diaper stolen from 7-Eleven. You can't get paid for that. If it had paid you, it surely would have been entitled to be paid for the amount it had paid you. Yes, Judge Wesley, that is exactly how maritime liens work. And so let's say we The difference between OW and the charter or owners wasn't that the charter paid them a percentage and then paid them an additional money that had to be provided to the supplier. They paid them X amount of dollars for the bunkers. The contract between OW and the suppliers said That's what I'm talking about. I'm talking about that contract is relevant but not determinative. The contract that's determinative, in my view, is the contract between the charter and OW. Yes. That's where the relationship has to start. And that charter, that contract embodied L4. And that contract embodied L4 saying the physical supplier will be paid. So what was it OW's responsibility if they had been paid to do that? It would be pay the physical supplier. They promised. By the way, had you not paid them, the only mechanism, had the charter not paid them, the only mechanism that OW would have had would have been what? A maritime lien? For its commission. To ensure that the supplier would be paid? For its commission. So that's because it creates an interesting result. OW has this obligation to provide bunkers and to pay for them. And the charter pays OW. It doesn't pay the supplier. It pays OW. So OW has an obligation there. And it all presumes that everybody's got the money and will pay it. Unfortunately, OW didn't. And in that situation, Your Honor, the question, post-November 7th, is now asked by every shipowner with a ship arrest is, did you pay the physical supplier? If the answer is yes, what's happened is that the trader has taken assignment of the physical supplier's rights. That's the way maritime liens work. When you pay them off, you are assigned them in just about every case. And that's the answer. And so has OW, has ING collected money that doesn't belong to it? Yes. That's what's happened. They're stepping into OW's rights. OW says, we will make sure the physical supplier is paid. All right. That's another question. But right now, we have a paradigm that's opened up since November 7th, nobody thought about before, which is, can there be multiple maritime lien claims against a specific ship for a supply? The answer is yes, there can be under L4. Under L4, when these arrests happen, what should have happened, for example, with the Temora, I think it's a $250,000 claim, Temora gets $250,000, and the OW entities assigned to ING get $1,500. And that's what Campitex, Judge and Martin Energy, and Judge Haight was only dealing with a narrow question. But what he said is, I'm leaving out there the question of what the overall impact of L4 is. I'm just going to look at, it was all about whether arbitration should be stayed. But when you read that opinion, you will say, yes, I understand. Now, Judge Haight applied L4 for what it was. The ship owner never had any direct contractual relationship with EKO, the supplier, never talked with them, other than the fact that EKO showed up and provided its bunkers. And that is all that L4 requires. The danger that there will be multiple payments to multiple suppliers is something that might happen when there is not an L4. But that's not what these cases are. We're not talking about anything else but a distinct contractual situation where, through L4, our suppliers become the persons providing necessary to the vessel on the order of an owner or person authorized by the owner. That's it. So let me finish up with Interpleter, though. Interpleter, essentially equitable. What's it supposed to do? Make sure that everybody gets paid what they're supposed to be paid. And Judge Russell, in your opinion, you cited, I think it was by Judge Hand, and it was an opinion where there was a materialman claiming a lien, and then there was somebody with a personam claim, and there was something else that came out of some other area of law. I forget what it was. And what you said was, this is what Interpleter is for. You've got arrest of vessels. You've got in personam claims. You've got foreign law. But here's the thing. There's only one amount due. There's $100,000 that the suppliers have thrown in the pot. Sorry, the ship owners, the charters have thrown in the pot, and they said, this is all we're supposed to pay. And the suppliers say, great, everybody's here. There's not going to be double claims. There's not going to be double recovery. There's not going to be a problem. Everybody in this courtroom is now represented with a claim. And what the court should do is make sure that everybody is paid what they're supposed to be paid. The Judge in Martin Energy says the law makes sense, and that is the only thing that makes sense here.  Thank you.